FILED
CLERK
10/6/2026 10:04 am
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

SUSAN LASK,

Plaintiff,

- against -

HARVEY SORID, JAY C. SORID, and PAULETTE ANGELA DENNIS,

Defendants.

-------------------------------------------------------------X

**MEMORANDUM AND ORDER**

Civil Action
No. 25-5724 (GRB)(JMW)

**GARY R. BROWN, United States District Judge**:

"This successful life we're living's got us feuding like the Hatfields and McCoys."
– Waylon Jennings, "Luckenbach, Texas"

This bizarre case has the flavor of a folktale, and like many such stories, this too obeys the rule of three: the litigation concerns a vicious, longstanding feud between plaintiff, Susan Lask, and three defendants—first, Paulette Angela Dennis, whom plaintiff long ago represented in a foreclosure action; second, Harvey Sorid, who represented Ms. Dennis in a subsequent malpractice action against plaintiff that concerned her billing during the aforementioned foreclosure representation; and third, Jay Sorid, Harvey's son. The gravamen of plaintiff's complaint here is that the malpractice action was tortious and in bad faith. This dispute, therefore, involves three nested cases—the instant action is derivative litigation of the malpractice lawsuit, and that lawsuit is in turn derivative of the original foreclosure suit.

This *sua sponte* opinion follows compulsorily from the Court's assessment that there is no federal subject matter jurisdiction over this case. To tie a bow on the

allegory, that jurisdictional inquiry was provoked in part by the Court's discovery that in other federal cases, plaintiff alternatively claimed domicile in three different states, simultaneously, depending on her litigation interests.

**Factual Background and Procedural History**

**I. Background as to Plaintiff's Claims**

The operative pleading for purposes of this opinion is plaintiff's Second Amended Complaint. Docket Entry ("DE") 54 (the "Complaint" or "SAC"). As alleged in the Complaint, in 2016, Dennis retained plaintiff to represent her in a "complex foreclosure matter." SAC ¶ 10. Plaintiff recounts that during that representation the following exchange occurred:

> While working on Dennis's case, Harvey Sorid called [p]laintiff on or about August 11, 2017, refused to identify himself, screamed profanities, called her a "fucking bitch," and threatened her career. Plaintiff later learned the caller was Harvey Sorid who was jealous of [p]laintiff's success in foreclosure cases and her fame in taking down Steven Baum because Sorid claimed he was an expert in foreclosure cases. . . . After that call, Sorid sent [p]laintiff a substitution of attorney for Dennis, demanded the return of earned fees, and then disappeared.

*Id.* ¶¶ 11–12. That confusing anecdote was not the end of the story. In 2021, Dennis, represented by Sorid, filed *Dennis v. Lask*, Index 705774/2021, a malpractice action in Queens County Supreme Court (the "Queens action").[1] The Queens complaint "alleged that Dennis paid [p]laintiff $75,000 for no compensable work and included a Fourth

[1] All references to "Sorid" without a first name refer to Harvey. While the Complaint suggests that Sorid's involvement in plaintiff's practice came without warning, other filings suggest that this litigation concerns antipathy stretching back at least sixteen years. *See* DE 28 at 1–2.

Cause of Action titled 'Undertaking Legal Representation in an Area in Which [plaintiff] was Not Competent.'" SAC ¶¶ 13–14.

A tortuous procedural history followed on the Queens docket. For present purposes it suffices to assume the following facts: (1) that Sorid repeatedly failed to appear in the Queens action, allegedly manufacturing delays through "deceits." *Id.* ¶¶ 16–29, 34–45; (2) that plaintiff sought sanctions on the Queens docket for those delays. DE 85–1; (3) that Justice Marshall of the Queens County Supreme Court issued an opinion on June 20, 2025, denying plaintiff's motion for sanctions, finding that "[g]iven [Sorid's] medical conditions, [Dennis's] failure to comply with discovery does not rise to the level of contumacious conduct. . . . [Sorid] provides a reasonable excuse for failure to comply with the prior discovery orders."[2] *Id.* at 3; (4) that plaintiff then filed a stipulation of discontinuance on the Queens docket, which provides that: "Plaintiff [Dennis] withdraws her action with prejudice," and "Defendant [Lask] withdraws all counterclaims with prejudice."[3] SAC, Ex. 2. The stipulation was filed in August 2025,

---

[2] The Court was initially made aware of the Justice Marshall opinion because defense counsel placed it on this docket, but the Court now takes judicial notice of the opinion and other relevant materials on the Queens docket as public filings. *See Teamsters Nat'l Freight Indus. Negotiating Comm. v. Howard's Express, Inc. (In re Howard's Express, Inc.)*, 151 F. App'x 46, 48 (2d Cir. 2005); *see also Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("Courts routinely take judicial notice of documents filed in other courts.").

[3] Although not before the Court in this procedural posture, preliminary examination of evidence submitted for jurisdictional review suggests that plaintiff's submission of the stipulation was at best fundamentally misleading. While Sorid initially sent the stipulation to plaintiff on April 16, 2024, SAC, Ex. A, plaintiff rejected that stipulation the same day, writing: "Mr. Sorid's email to the court of a stipulation of dismissal is improper and rejected. I again request that he cease sending the court his emails he uses to litigate the case with. I await the decision on the motion for sanctions," DE 80, Ex. 2. Plaintiff

but is internally dated April 12, 2024. *Id.*; and lastly (5) that Dennis later submitted a letter on the docket stating that she had not authorized filing the stipulation and that she still wished to prosecute the Queens action. SAC ¶¶ 61–67.

Plaintiff also alleges that, over the course of the Queens litigation, Harvey and Jay Sorid interfered with her relationships with other clients and co-counsel. Plaintiff identifies four specific incidents of note. First, plaintiff claims that Jay Sorid told her co-counsel in another matter that Harvey Sorid "brought a malpractice case against her." SAC ¶¶ 68–69. Second, plaintiff states that she once tried to secure counsel to represent her in a veterinary malpractice lawsuit, but that one prospective attorney saw the Sorids' allegations against plaintiff online, leading the attorney to decline representation. *Id.* ¶ 82. Third, plaintiff alleges that Harvey Sorid used the Queens docket to publish inflammatory accusations concerning William Watkins, plaintiff's client in an unrelated case, thereby "causing strain in the attorney-client relationship and forcing [p]laintiff to spend time explaining the humiliating Dennis litigation to Watkins." *Id.* ¶ 112. Finally, plaintiff alleges that Harvey Sorid communicated with plaintiff's client "Armstrong" (no first name is given) and made several improper statements that resulted in Armstrong "thereafter disappear[ing]," leading plaintiff to lose fees. *Id.* ¶¶ 74–77.

---

only docketed the stipulation a year later, and *after* Justice Marshall denied plaintiff's motion for sanctions. DE 75-6. Plaintiff now contends that she rejected only Sorid's *use of email to transmit* the stipulation but did not reject the stipulation itself. *See* DE 77 at 1–2. That argument is unserious.

Before reaching the substance of plaintiff's claims, however, the Court is required to assess its own jurisdiction. That analysis proves fatal to plaintiff's Complaint.

## II. Background as to Jurisdiction

When plaintiff commenced this action on October 11, 2025, she cited the diversity statute, 28 U.S.C. § 1332, as the basis for this Court's subject matter jurisdiction. DE 1 ¶ 5. The initial complaint, however, alleged only that defendants were citizens of New York, while plaintiff was "not a domicile of the State of New York." DE 1 ¶¶ 7–10. Such a recitation was deficient since it did not "affirmatively plead" plaintiff's citizenship, as required to establish with specificity that plaintiff was a citizen of a different state than defendants. Consequently, Magistrate Judge Wicks ordered plaintiff to file "a declaration setting forth her citizenship for diversity purposes." Order of Judge Wicks dated Jan. 8, 2026. Plaintiff responded to Judge Wicks's order a week later, stating "at the time this action was commenced, I was a citizen of the State of New Jersey for purposes of [ ] § 1332." DE 10.

Around that time, the Court became concerned that plaintiff's operative complaint (then, the First Amended Complaint ("FAC")) did not plausibly allege the $75,000 in damages required to meet the jurisdictional minimum. On May 13, 2026, the Court held a pre-motion conference and dismissed the FAC for failure to comply with Rule 8. The Court explained that the FAC did not plead damages with sufficient specificity and granted plaintiff leave to amend the complaint a second time. *See* May 13th Tr. Plaintiff did so, filing the Second Amended Complaint ("SAC") on May 30,

2026, along with her co-counsel Jeffrey Arlen Spinner. It remains the operative complaint in the case. In response, defendants submitted pre-motion letters seeking a conference for leave to file a motion to dismiss for a second time. *See* DE 55, 56. In reviewing these submissions, the Court remained concerned that plaintiff had not plausibly stated an amount in controversy in excess of $75,000, and defendants also raised several additional grounds for dismissal. Before briefing on those issues could begin, however, the Court became aware of serious questions regarding the reliability of plaintiff's declaration regarding her domicile.

In a September 2025 decision of which the Court later became aware, the Honorable Margaret M. Garnett of the Southern District of New York adopted a report and recommendation issued by Magistrate Judge Robert W. Lehrburger of the same district. *Lask v. Rhee-Karn* ("*Rhee-Karn*"), No. 24-CV-02666 (MMG), 2025 WL 2717474 (S.D.N.Y. Sep. 24, 2025). Judge Lehrburger found "by clear and convincing evidence, that [plaintiff] acted in bad faith by failing to be candid with the Court and vexatiously multiplying proceedings," and Judge Garnett agreed, adopting Judge Lehrburger's factual findings, imposing sanctions on plaintiff for failing to properly identify her domicile, and referring plaintiff to the Southern District's grievance committee. *Rhee-Karn* at DE 83, 104.

The Court held another pre-motion conference on August 13, 2026, this time to discuss defendants' anticipated motion to dismiss the SAC under Rule 12(b)(6) of the Federal Rules of Civil Procedure. While preparing for that conference, the Court identified perceived inconsistencies between defense counsel's assertions at the May

13th conference and the state court record that necessitated a hearing. The Court likewise found a hearing necessary to ascertain its subject matter jurisdiction. Accordingly, at the August 13th conference, the Court held the motions to dismiss in abeyance and scheduled a hearing for August 25, 2026, to address the two outstanding threshold issues. *See* May 13th Tr.

During the interim and in light of plaintiff's misrepresentations as detailed in the Garnett Opinion, the Court conducted a *sua sponte* review of plaintiff's representations regarding her domicile in this and other contemporaneous cases. The Court identified the same misrepresentations established by Judge Garnett and Judge Lehrburger, in addition to several additional misrepresentations not included in Judge Lehrburger's report and recommendation.

In one particularly egregious example, plaintiff attested to different courts that in April 2024 she was simultaneously domiciled in three states—Florida, New Jersey, and New York—depending on which position suited her litigation strategy.[4] *See Lask v. Fallon* ("*Fallon*"), No. 24-CV-4751 (July 9, 2024 E.D.N.Y.) at DE 1 ¶ 1; *Rhee-Karn* at DE 64, DE 121 ¶ 8, DE 95-1 ¶¶ 4–5. In another troubling example, plaintiff claimed Florida as

[4] *Compare Fallon* at DE 1 ¶ 1 ("At all times mentioned herein, Plaintiff Susan Lask is an individual and natural person domiciled in the State of Florida."), *and Rhee-Karn* at DE 64 ("Plaintiff's state of citizenship (which is based on domicile, not residence) . . . at the time Defendants filed for removal to federal court [in April 2024] was Florida.") *with Rhee-Karn* at DE 121, ¶ 8 ("Plaintiff Susan Lask is an attorney who resided in New Jersey when Defendants removed the state-court Summons with Notice to this Court in April 2024."), *and Rhee-Karn* at DE 95-1, ¶¶ 4–5 ("During the period from April through June 2024, I considered New York to be my permanent home. . . [M]y actions at the time . . . reflected a genuine and good faith belief that New York was my domicile.").

her domicile for all relevant times mentioned in her *Fallon* pleadings, despite arguing the opposite in *Rhee-Karn*.[5] Inexplicably, plaintiff went so far as to submit a sworn declaration in *Rhee-Karn*, stating that she "never intended to remain [in Florida] permanently," "considered New York to be [her] permanent home," and took steps "reflect[ing] [her] clear intent to make New York [her] domicile" at the same time she was claiming Florida citizenship in *Fallon*.[6] Those contradictions are only a sample.[7]

While plaintiff maintains that these misrepresentations were only misunderstandings, the sequence of plaintiff's conduct betrays bad faith. In a December 2024 *Fallon* filing, plaintiff disclaimed any connection to New York during that litigation, *before* plaintiff swore that she believed New York to be her domicile for

---

[5] In a *Rhee-Karn* submission, plaintiff argued that claiming domicile in Florida "at all times" mentioned in the initial *Fallon* complaint was an error that she corrected through the first amended complaint in *Fallon*. *Rhee-Karn* at DE 44, at 1. No such rationale appears on the *Fallon* docket, and her explanation is in any event irrelevant as to the July 2024 date of commencement in *Fallon*, because plaintiff *again* described her domicile at commencement as Florida in a proposed second amended complaint filed in *Fallon* in January 2025. *See Fallon* at DE 34.

[6] Plaintiff attempted in her *Rhee-Karn* declaration to avoid an explicit claim that she was domiciled in New York in July 2024, when the *Fallon* complaint was filed. However, plaintiff argued in that declaration that her plans for a New York move "reflected [her] clear intent to make New York [her] domicile," and permitted her to claim domicile in New York so long as she was planning to move there. *Rhee-Karn* at DE 95-1 ¶¶ 4–5. When combined with plaintiff's concession that *Fallon* was filed "during the time of my intended move to New York on July 9, 2024," *id.* ¶ 8, the only possible conclusion is that plaintiff again claimed different domiciles for the same time period.

[7] Plaintiff also misled federal courts as to when she relocated from Florida. *Compare Fallon* at DE 34-3 (reflecting residence in Florida in September 2024), *with Rhee-Karn* at DE 84 ("I relocated from Florida in July 2024."), *and Rhee-Karn* at DE 95, at 21 (plaintiff "ultimately relocated August 30, 2024.").

much of 2024. *Compare Fallon* at DE 28, at 6–7 (Dec. 16, 2024) ("Lask was never a domicile of New York during this litigation and to date [December 16, 2024]."), *with Rhee-Karn* at DE 95-1 ¶ 5 (June 16, 2025) ("[M]y actions [during the time of the planned move to New York]—including securing housing and severing connections in Florida—reflected a genuine and good faith belief that New York was my domicile.").

The order of plaintiff's statements is highly significant. Plaintiff reversed course from *Fallon* to claim New York citizenship in *Rhee-Karn*, only *after* Judge Lehrburger threatened her with sanctions for falsely implying that she resided in New York. That sequence compels the inference that plaintiff contrived her "genuine and good faith belief that New York was [her] domicile" to avoid sanctions in the Southern District. Because plaintiff concedes that *Fallon* was filed during the time of her intended move to New York, *see supra* n.6, plaintiff would have disclosed her purported New York citizenship to Judge Wicks in *Fallon* if she actually believed that she had New York citizenship in 2024. She did not do so. The conclusion is inescapable that she purposefully misled federal courts. Deception is inherently illegal and improper for any litigant; however, it is especially unforgivable for an attorney admitted to this Court.

In light of that history, the Court grew increasingly concerned about plaintiff's asserted domicile and her claim that she incurred more than $79,000 in legal fees (the only damages alleged with any specificity in the complaint). It seemed implausible that any reasonable person would incur that quantum of legal fees when the underlying litigation in which those fees were allegedly generated involved an amount in

controversy less than the fees alone—only $75,000. SAC ¶ 14. Under the circumstances, the alleged legal fees appeared on their face to be a bad faith attempt to manipulate jurisdiction, similar to plaintiff's previous misrepresentations concerning her domicile, cataloged above.

On August 25, 2026, the Court held the scheduled evidentiary hearing to evaluate its jurisdiction. Plaintiff called her co-counsel, Mr. Spinner, and placed into evidence purported summaries of billing records. Plaintiff also entered printed, typed timesheets supposedly created by Mr. Spinner contemporaneous to his work on the Queens action and from which the summaries were ostensibly derived. On cross-examination, defense counsel questioned Mr. Spinner on the process by which the summaries were generated. Mr. Spinner testified that he created the summaries himself, and the following colloquy occurred:

> Q. So you were there by yourself creating this quarterly billing and you relied on software that you possessed, yes?
>
> A. I relied on my records that I retained.
>
> Q. Those records are on your computer? They're digital, they're not in a file cabinet, yes?
>
> A. They're on my laptop, yes.
>
> Q. In that laptop, there must be evidence of correspondence between you and Ms. Lask concerning these supposed billings. Yes or no?
>
> [. . .]
>
> A. Aside from your characterization as purported or alleged billing, however you put it. Yes, I'm sure there is correspondence.

Aug 25th Tr. at 86:9-87:1.

Mr. Spinner did not present any evidence of correspondence, however, because he testified that he never sent bills to plaintiff by email; instead, he supposedly printed each bill and sent it to plaintiff by "ordinary mail." *Id*. at 87:15–23. As Mr. Spinner conceded, this meant that he possessed no documents indicating he sent any invoices to plaintiff; his testimony was the only evidence. *Id*. at 87:24–88:7.

That testimony seemed dubious. But because Mr. Spinner referenced retained electronic records, the Court believed it could review the accuracy of the timesheets. Accordingly, after the hearing, the Court ordered Mr. Spinner to produce to the Court *in camera* the digital records that were allegedly "on [his] laptop," specifically: "(1) the quarterly bills sent to Ms. Lask that were produced at the August 25, 2026 hearing and (2) the time records from which he derived those quarterly bills. These records and bills shall be provided in **their original electronic form, preserving all metadata demonstrating their contemporaneous creation.**" Order dated Aug. 26, 2026 (emphasis in original).

Mr. Spinner did not do so. Instead, he filed a letter to the Court claiming that he "did not use billing software nor [ ] an electronic document management system" and that his retained records consisted of only printed copies of a "billing document" that he maintained on his HP laptop. *See* DE 93. Microsoft Word retains information regarding the date of a document's creation, and so that file would have permitted the Court to authenticate whether Mr. Spinner's bills were created contemporaneously. However, Mr. Spinner represented to the Court that "the HP laptop on which [he] had prepared the historical billing documents sustained a hard drive failure and so it was

discarded in September of 2025." DE 93. As for his testimony that the records were "on my laptop," Mr. Spinner purported to explain that he "was referring to where [he] maintained those records during the period being discussed…[and] did not intend to state that historical native files still remained on a computer in [his] possession as of August 25, 2026." *Id*.

While plaintiff's inability to provide contemporaneous records is problematic, the hearing adduced a further material problem when Mr. Spinner testified that plaintiff in fact had made *no payments whatsoever* toward her purported bills:

> Q. Does Ms. Lask remain obligated to you to pay legal fees?
>
> A. Absolutely, under that agreement.
>
> THE COURT: Wait a minute. Obligated -- did she pay any of those fees?
>
> THE WITNESS: She has not, your Honor. I have chosen to defer payment.
>
> THE COURT: She's paid none of them, zero?
>
> THE WITNESS: That's correct, your Honor.

Aug. 25th Tr. at 51:11–19. And while Mr. Spinner testified that he "would expect" to get paid at some point, he added that he is "not demanding it" and conceded on cross that he had represented plaintiff in several other matters but had likewise deferred payment in those representations. *Id*. at 52:4–11; 80:5–8. Plaintiff requested re-direct because there were "things that [she] need[ed] to rehabilitate," id at 108:9–10, and succeeded in establishing that while she had not paid Mr. Spinner any fees, she had once taken him out to lunch "in lieu of for [his] appearance that day," *id*. at 111:8–14. The benefit of that factual development was short-lived. Soon after, the Court asked Mr. Spinner: "You're

not expecting to be paid because you told her it was okay, fair?" to which Mr. Spinner replied "[a]t this point, I'm not expecting to be paid; that's correct." *Id*. 111:22–112:2.

Mr. Spinner also conceded an additional problem when he admitted he was unable to disentangle the legal fees incurred for work on plaintiff's defense in the underlying action versus his time spent preparing affirmative counterclaims:

> THE COURT: So if I look at the bills that you have submitted, how do I allocate your work between the counterclaims and defending the case?
>
> THE WITNESS: Well, your Honor, I took it as a package deal, not as, well, we'll do something separate for counterclaims and we'll this and we'll that. To me, interposing the affirmative defenses and the counterclaims were part and parcel of the defense.

*Id*. at 105:4–11. Such imprecision does not aid review.

As for her domicile, plaintiff reluctantly provided the Court with a New Jersey driver's license at the hearing, though the address listed on the license was a P.O. box.

**Standard of Review**

"It is axiomatic that federal courts are courts of limited jurisdiction and may not decide cases over which they lack subject matter jurisdiction," which "may be raised at any time by a party or by the court *sua sponte.* If subject matter jurisdiction is lacking, the action must be dismissed." *Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 700–01 (2d Cir. 2000).

Alternatively, district courts also possess the discretion to dismiss claims on their own initiative under Rule 12(b)(6). *Leonhard v. United States*, 633 F.2d 599, 609 n.11 (2d Cir. 1980) ("The district court has the power to dismiss a complaint *sua sponte* for failure

to state a claim"); *see also Dickerson v. Mut. of Am.*, 703 F. Supp. 2d 283, 294 (S.D.N.Y. 2010) (citing *Leonhard*); *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 364 (2d Cir. 2000) ("district courts may dismiss a frivolous complaint *sua sponte*"). That authority includes claims precluded by collateral estoppel. *See Smeraldo v. City of Jamestown*, 512 F. App'x 32, 34 (2d Cir. 2013) (citing *Curry v. City of Syracuse*, 316 F.3d 324, 331 (2d Cir. 2003)).

District courts regularly perform this alternative analysis under Rule 12(b)(6), even where a complaint is dismissed for failure to meet the amount in controversy in the first instance. *See Solomon v. Amazon.com, Inc.*, No. 18-CV-5528 (ERK)(PK), 2019 WL 2601794, at *2 (E.D.N.Y. June 24, 2019) (dismissing complaint for failure to sufficiently allege damages, but finding "if I were to entertain the Complaint's allegations on the merits, I would still dismiss").

In such circumstances, courts pose the familiar question of whether, assuming the allegations of the complaint to be true solely for the purposes of the motion, the Complaint sets forth factual material to render the claims plausible. *Burris v. Nassau Cnty. Dist. Att'y*, No. 14-CV-5540 (JFB) (GRB), 2017 WL 9485714 at *3–4 (E.D.N.Y. Jan. 12, 2017), *adopted by* 2017 WL 1187709 (E.D.N.Y. Mar. 29, 2017).

**Legal Analysis**

**I. Subject Matter Jurisdiction**

"The plaintiff bears the burden of showing that there is a 'reasonable probability that the claim is in excess of the statutory jurisdictional amount'" of $75,000. *Int'l*

*Christian Broad., Inc. v. Koper*, 928 F. Supp. 2d 559, 562 (E.D.N.Y. 2013) (quoting *Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003). That burden usually is not onerous because the Second Circuit "recognizes a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." *Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir. 1999).

However, "where a complaint does not contain facts plausibly suggesting that the amount in controversy meets the jurisdictional minimum, the Court is not required to presume that the bare allegations in the complaint are a good faith representation of the actual amount in controversy." *Patel v. Patel*, No. 23-CV-8765 (LTS), 2024 WL 37094, at *2 (S.D.N.Y. Jan. 3, 2024); *see also Weir v. Cenlar FSB*, No. 16-CV-8650 (CS), 2018 WL 3443173, at *12 (S.D.N.Y. July 17, 2018) ("the jurisdictional amount, like any other factual allegation, ought not to receive the presumption of truth unless it is supported by facts rendering it plausible."). Indeed, even when a cause of action entitles a plaintiff to treble damages, courts regularly dismiss on subject matter jurisdiction grounds where the allegations do not supply the court with a good faith basis for jurisdiction. *See, e.g., Nanya-Amir El v. 2000 New Century Travel Inc.*, No. 09-CV-798 (DLI), 2009 WL 899679, at *1 (E.D.N.Y. Mar. 27, 2009) ("Based on plaintiff's submissions, the court concludes that the amount in controversy fails to suggest a 'reasonable probability' that damages would be in excess of $75,000, notwithstanding plaintiff's claim for treble damages.").

In any posture, damages to non-parties are not part of the jurisdictional analysis, and "[i]n measuring the value of a claim for jurisdictional purposes, 'the amount in controversy is calculated from the plaintiff's standpoint; the value of the suit's intended benefit or the value of the right being protected or the injury being averted constitutes the amount in controversy when damages are not requested.'" *Doe v. CBS Broad., Inc.*, No. 04-CV-312 (SAS), 2004 WL 1586409, at *2 & n.15 (S.D.N.Y. July 15, 2004) (quoting *Kheel v. Port of New York Auth.*, 457 F.2d 46, 49 (2d Cir. 1972)).

Disproving good faith depends on whether a court can determine "to a legal certainty that the claim is really for less than the jurisdictional amount" based on what appears "from the face" of the complaint." *Chase Manhattan Bank, N.A. v. Am. Nat. Bank & Tr. Co. of Chicago*, 93 F.3d 1064, 1070 (2d Cir. 1996) (citing *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938)). The legal certainty test can nevertheless be applied retroactively, and "even when plaintiffs commence a suit with the good faith belief that their claim is over the statutory jurisdictional amount, if the actual amount in controversy is later determined to be below the statutory jurisdictional amount as of the date of the filing of their claim, the case should be dismissed for want of jurisdiction." *Graubart v. Jazz Images, Inc.*, No. 02-CV-4645 (KMK), 2006 WL 1140724, at *3 (S.D.N.Y. Apr. 27, 2006) (citing *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 785 (2d Cir. 1994)); *see also Riddles v. Sallie Mae*, No. 08-CV-1499 (NG), 2009 WL 3734302, at *3 (E.D.N.Y. Nov. 4, 2009). "A plaintiff's good faith belief as of the filing date may be ascertained by reference to the pleadings and any facts on that subject adduced in discovery." *Chase Manhattan Bank, N.A.*, 93 F.3d at 1070.

These restrictions follow naturally from the principle that "[n]o one is entitled to file in federal court and throw on the defendant (and the judicial system) the entire burden of estimation plus the risk of uncertainty in that process," meaning therefore that "[w]hen the monetary value of a controversy cannot be estimated, litigation must commence in state court." *Ditolla v. Doral Dental IPA of New York, LLC*, No. 06-CV-762 (SJF)(ETB), 2006 WL 5618179, at *3 (E.D.N.Y. Apr. 21, 2006) (quoting *Macken v. Jensen*, 333 F.3d 797, 800 (7th Cir. 2003) (Easterbrook, J.), *aff'd sub nom. DiTolla v. Doral Dental IPA of New York*, 469 F.3d 271 (2d Cir. 2006).

Here, plaintiff alleges that she is entitled to $79,000 in legal fees and costs, which would treble to $237,000 under § 487.[8] SAC ¶¶ 84, 91. Plaintiff clarifies that approximately $1,450 of those (pre-trebled) damages are attributable to costs, while the balance consists of legal fees plaintiff purportedly owes to Mr. Spinner, her co-counsel in both the instant case and the Queens action. Aug. 13th Tr. at 4:8–16. However, plaintiff has not plausibly established that she incurred *any* fees in the Queens action. It

---

[8] In the Complaint, plaintiff further claims unspecified additional damages for reputational harm and loss of clients. *See*, *e.g.*, SAC ¶¶ 90, 98, 100, 121. Plaintiff also seeks punitive damages. *Id.* at 21. The Court rejects these requests—to which plaintiff has not even attempted to attach a dollar figure—as speculative and inactionable. *See Patel*, 2024 WL 37094. Reputational damages would be difficult to establish in any event, given the pattern of sanctions and other discipline already levied against plaintiff. Judge Garnett's aforementioned imposition of sanctions against plaintiff is the latest example, but the fact that plaintiff was previously referred to the United States Marshal in the Southern District of New York, *see Rhee-Karn v. Lask*, 797 F. Supp. 3d 343, 374 (S.D.N.Y. 2025), and has been the subject of at least one ethics investigation in New Jersey, *see Lask v. Jones*, No. CV 23-2987 (MAS) (JBD), 2024 WL 1256795, at *1 (D.N.J. Mar. 25, 2024) ("Plaintiff alleges that the OAE's ongoing disciplinary investigation of Plaintiff is improper . . . ."), only bolsters the Court's conclusion.

is well-settled that "[t]he law in this circuit is that no award for attorneys' fees is appropriate where the attorney failed to maintain contemporaneous time records." *Kottwitz v. Colvin*, 114 F. Supp. 3d 145, 150 (S.D.N.Y. 2015) (citing *NYSARC v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983). And the burden is on the plaintiff "to keep and present records from which the court may determine the nature of the work done, the need for it, and the amount of time reasonably required." *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1265 (2d Cir. 1987); *accord Cruz v. Local Union No. 3 of the IBEW*, 34 F.3d 1148, 1160–61 (2d Cir. 1994). Importantly, "[a] recreation of time records based on documents, calendars and other extrinsic evidences is insufficient." *Kottwitz*, 114 F. Supp. 3d at 150. Instead, "to satisfy *Carey* the proof must demonstrate that original contemporaneous entries of sufficient specificity were punched into or logged in a database from which the printouts or summaries are derived." *Handschu v. Special Services Div.*, 727 F. Supp. 2d 239, 250 (S.D.N.Y. 2010).

In light of that guidance, the Court rejects the purportedly contemporaneous billing submitted by plaintiff and Mr. Spinner. Mr. Spinner testified at the August 25, 2026 hearing that his bills "[a]re on my laptop" and that he was "sure there is correspondence" between him and plaintiff regarding his invoices. Aug. 25th Tr. at 86:9–87:1. However, when the Court demanded the files that Mr. Spinner testified were on his laptop, Mr. Spinner claimed there were no electronic copies of the bills and that the laptop containing the files had "sustained a hard drive failure," leading him to "discard[ ]" it over a year prior. DE 93. It is difficult to reconcile Mr. Spinner's testimony with his post-hearing letter, and his explanation "can most charitably be

termed 'fanciful.'" *Matter of Hartford Textile Corp.*, 613 F.2d 384, 386 n.3 (2d Cir. 1979). Nor are Mr. Spinner's billing summaries competent to establish any fees, since summaries cannot be considered without underlying documentation of contemporaneous timekeeping. *Handschu,* 727 F. Supp. 2d at 250.

Even if Mr. Spinner supported his fees through contemporaneous billing, however, plaintiff still would not prevail because plaintiff's damages are manufactured. Mr. Spinner agreed at the August 25th hearing that plaintiff had paid "none of [the fees], zero" and added that despite representing plaintiff in several other prior matters, he had never been paid for those either. Aug. 25th Tr. at 51:11–19, 52:4–11, 80:5–8. Mr. Spinner also conceded: "[a]t this point, I'm not expecting to be paid; that's correct." *Id.* 112:1–2. Plaintiff, therefore, suffered no injury at all from Mr. Spinner's work on the Queens action. *Cf. Berardi v. Berardi*, No. 23-1011-CV, 2024 WL 1269902, at *2 (2d Cir. Mar. 26, 2024) ("Although an alleged injury suffices to confer jurisdiction when it is certainly impending, a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.") (cleaned up) (quoting, *inter alia*, *Texas v. United States*, 523 U.S. 296, 300 (1998)).[9]

Call it what it is: plaintiff's § 487 claim is a contrivance designed to remit to Mr. Spinner fees he never expected to receive and to plaintiff the balance of the treble

---

[9] Any "damages" that Mr. Spinner may have himself incurred by performing work for which he was unpaid are not relevant here. Mr. Spinner is not a party. And plaintiff is not entitled to damages based on speculation as to whether Mr. Spinner will later demand payment on the alleged unpaid fees.

damages assessed by statute.[10] The records categorically do not supply the Court with a good-faith basis for jurisdiction, and the Court rejects them as both non-contemporaneous and as unpaid and consequently inactionable.[11] *See Jones v. Charter Commc'ns LLC*, No. 18-CV-5953 (NG)(LB), 2019 WL 1760841, at *4 (E.D.N.Y. Apr. 22, 2019) ("Because they are unavailable under one statute and discretionary under the other, I will not consider attorneys' fees in calculating the amount in controversy.").

Plaintiff's remaining enumerated damages consist of $1,450 in costs. Assuming those damages are recoverable, they fall far short of the jurisdictional minimum, even trebled. Finally, to the extent that plaintiff seeks further, unenumerated damages, the Court rejects those demands as vague and insufficient. *See Smith v. Parsons*, No. 09-CV-2921(BMC), 2009 WL 3052631, at *2 (E.D.N.Y. Sep. 22, 2009) (dismissing case where "[e]ven after granting plaintiff leave to amend, his allegations are insufficient to confer diversity jurisdiction over this matter"). The case must therefore be dismissed for lack of subject matter jurisdiction.[12]

---

[10] Mr. Spinner's testimony also raised a third problem—plaintiff has not proposed a way to assess the share of Mr. Spinner's fees that would be attributable to his work defending plaintiff in the Queens action versus his work on counterclaims, for which plaintiff could not possibly be reimbursed. Because the Court finds that the fees are inactionable for other reasons, the Court does not reach this issue, besides to note that it would severely limit any award of attorney's fees, were those fees recoverable in the first instance.

[11] Mr. Spinner's testimony and his status as co-counsel raises serious ethical concerns as to his own conduct. *See*, *e.g.*, New York Rules of Professional Conduct 1.2(d) and 3.3.

[12] Plaintiff has met her burden to establish diversity of domicile for the time being, but the Court is exceedingly troubled by her past sanctioned conduct on the issue. Those

## II. Merits

Alternatively, even assuming that plaintiff did meet the amount in controversy threshold, the Court would dismiss each of the claims on Rule 12(b)(6) grounds.

### a. *Judiciary Law § 487*

To begin, plaintiff's claim under Judiciary Law § 487 would be precluded because Justice Marshall already dismissed plaintiff's motion for sanctions against Harvey Sorid in the Queens action. The statute reads:

> an attorney or counselor who:
>
> 1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; or,
>
> 2. Wilfully delays his client's suit with a view to his own gain; or, wilfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for,
>
> Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

N.Y. Judiciary Law § 487. Plaintiff identifies a string of extensions and other dilatory behavior that Harvey Sorid allegedly exhibited in the Queens action. Unfortunately for plaintiff, a judge more familiar with that docket has already considered her allegations and found them meritless. In her June 20, 2025 order, Justice Marshall of the Queens County Supreme Court denied plaintiff's motion for sanctions against Sorid, which alleged substantially identical misconduct to that alleged against Sorid here. In the

---

concerns are, to say the least, not alleviated by her employment of a P.O. box as her address on her driver's license.

order, Justice Marshall specifically found that "[g]iven [Harvey Sorid's] medical conditions, [Dennis's] failure to comply with discovery does not rise to the level of contumacious conduct. . . . [Sorid] provides a reasonable excuse for failure to comply with the prior discovery orders." DE 85–1 at 3.

In light of that ruling, the Court finds that the elements of collateral estoppel are satisfied—the sanctions briefing process afforded plaintiff a full and fair opportunity to litigate, and the Marshall decision adjudicated legally identical issues to those pending in the instant case. *See Jenkins v. City of New York*, 478 F.3d 76, 85 (2d Cir. 2007) (citing *Juan C. v. Cortines,* 89 N.Y.2d 659, 667 (1997)). The Second Department has affirmed enforcing preclusion in these circumstances, explaining, "[s]ince the plaintiff had a full and fair opportunity to address the alleged violations which were the subject of his sanction applications, and those applications were denied, he is barred by the doctrine of collateral estoppel from relitigating those issues" in a § 487 action. *Gillen v. McCarron*, 6 N.Y.S.3d 253, 254 (2d Dep't 2015) (collecting cases). The Second Circuit recently endorsed the approach, too. In *Weir v. Montefiore Medical Center*, the panel found that a plaintiff's claim that "the attorney defendants responded late to his discovery demands, made false statements, and conspired to deceive the court" had already been "addressed . . . when the court denied [plaintiff's] cross-motion to hold the attorneys in contempt and to sanction them." No. 24-1527, 2025 WL 289497, at *3 (2d Cir. Jan. 24, 2025). Therefore, "[b]ecause each of [plaintiff's] claims against the attorney defendants relies on issue precluded matters," the panel found that "the district court

did not err in dismissing those claims *sua sponte*." *Id.*; *see also Radiation Oncology Servs. of Cent. N.Y., P.C. v. Warren*, 204 N.Y.S.3d 619, 621 (3d Dep't 2024) (similar).[13]

Accordingly, if the Court did have subject matter jurisdiction, plaintiff's § 487 claim would alternatively be precluded by collateral estoppel, and the claim would properly be dismissed under Rule 12(b)(6).

**b. *Malicious Prosecution***

"Courts have repeatedly found that where the underlying litigation is ongoing, the litigation has not terminated in the plaintiff's favor for the purposes of a malicious prosecution claim." *Sherwyn Toppin Mktg. Consultants, Inc. v. Gluck*, No. 11-CV-3951 (MKB), 2012 WL 4364490, at *7 (E.D.N.Y. Sep. 25, 2012). The Court has taken judicial notice of the *Dennis v. Lask* docket in the Queens action, and that docket reveals that the case has not been closed, meaning the malicious prosecution claim is premature.

Plaintiff attempts to avoid that disposition by alleging in the Complaint that the Queens action was reopened merely as a scheme to defeat liability in this litigation. SAC ¶¶ 61–67. To that end, plaintiff cites the purported stipulation of dismissal. *Id.*, Exs. B, C. Even if the stipulation of dismissal overrode the public activity on the docket, however, "[i]t is well-settled that an action terminated by settlement cannot sustain a malicious prosecution claim." *Liberty Synergistics, Inc. v. Microflo Ltd.*, 50 F. Supp. 3d 267, 287 (E.D.N.Y. 2014) (collecting cases).

---

[13] In light of the clear precedent on the subject, plaintiff's frivolous contention that a motion for sanctions imposes a legal standard distinct from that imposed by § 487 is foreclosed. If anything, § 487 imposes a higher burden.

"[C]ourts have repeatedly held that in the absence of a compromise or inducement offered by the plaintiff party in the underlying civil proceeding, the voluntary discontinuance with prejudice by that party is tantamount to a successful termination on the merits in favor of the defendant in the underlying civil proceeding." *See Hilfiger v. Bradlees, Inc.*, No. 99-CV-4677 (WK), 2002 WL 737477, at *7 (S.D.N.Y. Apr. 25, 2002). The purported stipulation of dismissal in *Dennis v. Lask*, however, released claims by both parties and is properly regarded as a negotiated settlement. Accordingly, the malicious prosecution claim must be dismissed, regardless of whether the state court case is active.

**c. *Slander***

Plaintiff's slander claim would fail because the challenged statement is true, even as alleged in the Complaint. Plaintiff asserts that "[o]n October 11, 2024, Jay C. Sorid published a false statement of fact to Alexander Dudelson, Esq., stating that Harvey Sorid 'brought a malpractice case' against [p]laintiff." SAC at ¶ 102. This, plaintiff alleges, was defamatory because "Harvey Sorid was not a malpractice plaintiff [in the Queens action] against [p]laintiff, no pending Harvey Sorid malpractice action against [p]laintiff existed, and the malpractice-based claim in the Dennis action had already been dismissed, rejected, or disclaimed." *Id.* ¶ 103. However, Harvey Sorid was the attorney who filed the *Dennis v. Lask* state court action, and even if the Court were to assume that the action was legally disposed at the time of Jay Sorid's statement, Sorid's use of the past tense renders the statement truthful as a matter of law. Harvey Sorid

had indeed "*brought*" a malpractice case against plaintiff as an attorney.[14] The statement was truthful, even if arguably incomplete. Therefore, the slander count would be dismissed under Rule 12(b)(6).

**d. *Tortious Interference***

Plaintiff's tortious interference claim would likewise be dismissed.

First, plaintiff's allegation that she lost prospective clients is speculative and inactionable. *See Thompson v. Bosswick*, 855 F. Supp. 2d 67, 83 (S.D.N.Y. 2012) ("even if it is assumed that [defendant] indeed made defamatory comments to [the third party], the Plaintiff's claim of tortious interference must be dismissed because the Plaintiff has failed to establish any harm."). A plaintiff's failure to identify "any specific contract [plaintiff] would have obtained" is fatal to a prospective tortious interference claim. *Johnson & Johnson v. Am. Nat. Red Cross*, 528 F. Supp. 2d 462, 464 (S.D.N.Y. 2008) (quoting *Vigoda v. DCA Prods. Plus Inc.*, 741 N.Y.S.2d 20 (1st Dep't 2002)). Plaintiff likewise fails to identify any actionable damages suffered due to Harvey Sorid's alleged contacts with her client William Watkins. Plaintiff's allegation of "strain" in the client relationship is entirely inactionable.

---

[14] Plaintiff's allegation that Dennis alone "brought" the action is spurious. *See* Black's Law Dictionary (12th ed. 2024) (defining "bring an action" as "[t]o sue; institute legal proceedings"); *Heintz v. Jenkins*, 514 U.S. 291, 295 (1995) (referring to effects of a statute on "any litigating lawyer who brought . . . a claim against a debtor," thus reflecting use of "brought" to describe attorney action); SAC ¶ 13 (reflecting that "Sorid filed *Dennis v. Lask*, Index 705774/2021, in Supreme Court, Queens County, on behalf of Dennis").

Plaintiff cites a single client, "Armstrong," who reportedly terminated his client relationship with plaintiff as a result of comments made by Harvey Sorid. However, plaintiff failed to adequately plead malice as required by New York law. In an action for tortious interference, the defendant's motive "must be solely malicious, and plaintiff has burden of proving this fact." *M.J. & K. Co. v. Matthew Bender & Co.*, 631 N.Y.S.2d 938, 940 (2d Dep't 1995). In the *prima facie* tort context, which likewise employs a requirement that the defendant's motive be "solely malicious," New York courts have explained that "[m]otives of profit, economic self-interest or business advantage are by their terms not malicious, and their presence, even if mixed with malice or personal animus, bars recovery." *Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 477 (S.D.N.Y. 2021) (quoting *Rodgers v. Grow-Kiewit Corp.-MK*, 535 F. Supp. 814, 816 (S.D.N.Y.), *aff'd sub nom. Rodgers v. Grow-Kiewit Corp.*, 714 F.2d 116 (2d Cir. 1982)). Based on the complaint, Harvey Sorid made the allegedly tortious comments to Armstrong in the context of litigation in which Sorid was himself a defendant and in which Sorid would have substantial economic self-interest. SAC ¶ 74. Plaintiff does not make the requisite allegation that Sorid's alleged comments were "solely malicious" under those circumstances, nor would such an allegation appear supported by the facts alleged in the complaint.

Plaintiff identifies two additional purported bases for the tortious interference claim, but both are inactionable as well. First, plaintiff claims that an attorney "declined to represent [p]laintiff [in a veterinary malpractice action] on the contemplated terms" due to that prospective attorney finding "the publicly available Dennis filings" during

intake." *Id.* ¶ 82. Second, plaintiff asserts that "co-counsel in another case found the Dennis filings and questioned [p]laintiff about the salacious and false statements," ultimately deciding to "stop[ ] working with [p]laintiff, causing [p]laintiff to lose counsel in that matter." *Id.* ¶ 81. In both examples, plaintiff fails to plausibly allege that defendants "knew of th[ose] relationship[s] and intentionally interfered" with them, as is required to sustain prospective tortious interference claims under New York law. *Johnson & Johnson*, 528 F. Supp. 2d at 464. The caselaw establishes that "defendants must have *actual* knowledge of th[e] specific relationship" that the defendants interfered with for that interference to be tortious. *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 546 (S.D.N.Y. 2014) (emphasis in original). Plaintiff fails to make that required allegation in the Complaint.

Consequently, plaintiff's tortious interference claim would be dismissed as implausible.

**e. *Abuse of Process***

Finally, plaintiff's abuse of process claim would be dismissed as well because plaintiff fails to allege damages specific to that claim, as required by state law. *See Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Tchrs. Ass'n, Inc.*, 38 N.Y.2d 397, 405 (1975) (noting that "plaintiff must allege and prove actual or special damages in order to recover" under an abuse of process cause of action). Plaintiff provides no specifics that plausibly suggest she suffered damages in the intervening three months since the docket activity in the state court action. Moreover, review of the

state court docket reveals neither a plausible basis for finding Dennis' filings to be tortious nor any indication that the challenged filings constitute "process" as is required to sustain such a claim under New York law. *See Conflict Int'l, Inc. v. Komorek*, No. 23-CV-02165 (ER), 2024 WL 1347577, at *11 (S.D.N.Y. Mar. 29, 2024) ("[plaintiffs] assert that defendants have initiated a wake of litigation, complaints, and filings . . . with the intent to harm plaintiffs' business. . . . [T]hese kinds of filings are not sufficient to state an abuse of process claim.") (cleaned up). Indeed, the New York Court of Appeals has made it clear that the challenged "process" must not only "direct[ ] or demand that the person to whom it is directed shall perform or refrain from the doing of some prescribed act," but also "interfere[ ] with one's person or property." *Manhattan Enter. Grp. LLC v. Higgins*, 816 F. App'x 512, 514 (2d Cir. 2020) (quoting *Williams v. Williams*, 23 N.Y.2d 592, 596 (1969)). There is no suggestion that any of Dennis's actions on the state court docket meet that elevated threshold.

**Conclusion**

Accordingly, the Second Amended Complaint is dismissed in its entirety for lack of subject matter jurisdiction, since plaintiff does not plausibly meet the amount in controversy threshold. Alternatively, the Court finds that if it did have subject matter jurisdiction, each of plaintiff's causes of action would nonetheless necessarily be dismissed under Federal Rule of Civil Procedure 12(b)(6). The Clerk of the Court is directed to close the case and enter judgment.

In light of plaintiff's past misrepresentations concerning her domicile before Judge Wicks, and this Court's concerns regarding her representations in this case, plaintiff is referred to the grievance committee of this district for further investigation. *See* New York Rule of Professional Conduct 3.3. Plaintiff is further ordered to inform the presiding judges of any active federal cases in which she appears as either an attorney or a party of her referral to the grievance committee within fourteen days by providing a copy of this opinion to the respective jurist. Under further order of this Court, plaintiff is directed to do the same in any future federal cases within fourteen days of commencement by filing a copy of this opinion on the docket of such case. Failure to comply with these deadlines will result in further sanctions.[15]

**SO ORDERED.**

Dated: October 6, 2026
Central Islip, New York

*/s/ Gary R. Brown*
GARY R. BROWN
United States District Judge

[15] The Court declines to exercise its discretion to stay these sanctions in the event that plaintiff appeals this decision. *See Raghavendra v. Trs. of Columbia Univ.*, No. 06-CV-6841 (PAC)(HBP), 2017 WL 6000553, at *6 (S.D.N.Y. Dec. 1, 2017) ("The Court can exercise its discretion to 'stay enforcement of the sanctions pending appeal.' But there is absolutely no reason here to exercise that discretion.") (quoting *De La Fuente v. DCI Telecomms., Inc.*, 269 F. Supp. 2d 237, 245 (S.D.N.Y. May 28, 2003)).